[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-11912
_____

D.C. Docket No. 4:08-cv-00355-MCR-CAS

HOME DESIGN SERVICES, INC.,

Plaintiff - Appellant,

versus

TURNER HERITAGE HOMES INC.,
FREDERICK E. TURNER,
DOUGLAS E. TURNER,
SUMMERBROOK HOMES, INC.,
GREENFIELD HOMES, INC.,

Defendants - Appellees.
_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(June 17, 2016)

Before TJOFLAT and ROSENBAUM, Circuit Judges, and GOLDBERG, Judge[*]

_____

[*] The Honorable Richard W. Goldberg, of the United States Court of International Trade, sitting by designation.

GOLDBERG, Judge:

Plaintiff Home Design Services, Inc. ("Home Design") has sued Defendants Turner Heritage Homes, Inc., et al. ("Turner") for copyright infringement on Home Design's architectural floor plan HDS-2089.  According to Home Design, two of Turner's floor plans, the Laurent and the Dakota, infringe on HDS-2089.  Home Design's lawsuit went to trial before the district court, and a jury returned a verdict in favor of Home Design, awarding $127,760 in damages.  Turner moved for judgment notwithstanding the jury's verdict under Rule 50(b), which the district court granted.  We affirm.

## BACKGROUND

Home Design registered HDS-2089 with the Copyright Office in August 1991.  Turner created the Laurent plan in 1999, and thereafter slightly modified the Laurent to create the Dakota.  Both HDS-2089 and the Laurent depict what is known as a "four-three split plan": a four-bedroom, three-bathroom house with a "master" bedroom or suite on one end and three more bedrooms on the other.  The plans, which are attached as an appendix, share in common the same set of rooms, arranged in the same overall layout.  The plans also share the presence, location, and function of many (but not all) walls, entryways, windows, and fixtures.

Before this case went to trial, Turner moved for summary judgment, arguing that the Turner plans did not infringe on HDS-2089 because the plans were not

2

"substantially similar" when it came to HDS-2089's copyright-protectable expression. The district court denied summary judgment, holding that

> while there [are] an abundance of small differences in areas of protectable expression, including the heights of walls, placement of windows, and the number of doors in some entryways, there are also myriad similarities in areas of protectable expression, including the arrangement and location of rooms, the unusual angle of the kitchen sink, the placement of the master bedroom and garage, and the common foyer at the entrance between the living and dining rooms. As a result of these many differences and many similarities in the areas of protectable expression, the [c]ourt is unable to conclude that, as a matter of law, no reasonable jury could find the works to be or not to be substantially . . . similar.

At trial, the district court heard testimony regarding HDS-2089 and the Turner plans. James Zirkel, Home Design's chief executive officer, compared HDS-2089 to the plan for the third Laurent home that Turner built. (Turner built over 160 homes using either the Laurent or Dakota plan.) Zirkel deemed the plans similar "except for a few minor parts," and specifically identified the layout of the rooms as shared. Zirkel classified as "minor" the differences between the plans' fireplace placements, orientation of water closets, and shape of living-room wall. (The Laurent's living room has a squared wall abutting the family room and foyer, while HDS-2089's has an angled wall.) Zirkel also conceded the following

3

"numerous small changes, but not major changes," some of which he classified as

"options":

|  | HDS-2089 | Laurent Plan Generally |
|---|---|---|
| Front Door | Double front door | Single front door |
| Front Porch | Projects beyond front bedroom and garage | Flush with front bedroom and garage |
| Foyer | Opens onto living spaces either without archways or columns | Archways and columns leading into living spaces |

In addition, with respect to the particular Laurent home he had looked at, Zirkel

identified a number of further "small changes" or "options":

|  | HDS-2089 | Third Laurent Home |
|---|---|---|
| Back Hallway | Squared entry; sliding pocket door | Archway entry |
| Pool Bathroom | Linen closet | No linen closet |
| Master Bedroom | Flat, ten-foot ceiling; plant shelves; windows have different sizes and locations | Vaulted ceiling; no plant shelves; windows have different sizes and locations |
| Living Room | Twelve-foot ceiling; windows have different sizes and locations | Ten-foot ceiling; windows have different sizes and locations |
| Secondary Bedrooms | Different ceiling heights; windows in rearmost secondary bedroom have different sizes and locations | Different ceiling heights; windows in rearmost secondary bedroom have different sizes and locations |
| Nook | Symmetrical angled walls with one window and a soffit | Asymmetrical angled walls with two windows |
| Kitchen | Smaller than Laurent; no desk; dishwasher in different location | Larger than HDS-2089; built-in desk; dishwasher in different location |
| Master Bathroom | Water closet orientation creates narrower space at end of kitchen/nook hallway; larger shower with walk-in area | Water closet orientation creates deeper space at end of kitchen/nook hallway; smaller enclosed shower |
| Master Closet | Four inches narrower | Four inches wider |

On cross-examination, Turner asked Zirkel about the originality of HDS-

2089.  Zirkel confirmed that HDS-2089 is a split plan, and that at the time that

Home Design created HDS-2809 approximately seventy percent of the builders he

4

dealt with were requesting split plans.  Later in the trial, Home Design introduced the deposition testimony of the Home Design employee who drafted HDS-2089.  According to the employee, "there's nothing fancy about [HDS-2089].  It's been done over and over again in different variations and iterations.  It's a 3–1 split,[1] three bedrooms on one side, a master in the rear.  It's . . . pretty generic."  At the time that the employee drafted HDS-2089, "[t]here were plans that were preexisting like this—three bedrooms on one side, pool bath, a master on the other side.  So it was a variation on different themes."

Turner also asked Zirkel to compare HDS-2089 to two plans that Home Design had created at an earlier date, the HDS-2041 and the Timberwood.  Turner's theory was that the same similarities Zirkel had identified between HDS-2089 and the Turner plans also surfaced when comparing HDS-2089 to its predecessors.  Zirkel confirmed that HDS-2041 and HDS-2089 share the same layout in terms of room location, but differentiated HDS-2041 based on differences in configuration.  Zirkel also testified that HDS-2089 and the Timberwood "are not substantially similar.  They are not strikingly similar.  They are a four-bedroom split plan."

---

[1] Although the employee labelled HDS-2089 a three–one split plan, rather than a four–three split plan, his underlying description of HDS-2089 as featuring four total bedrooms with three on one side and one on the other matches the definition of a four–three split plan.  (The definition also has to do with the number of bathrooms—three—which the employee did not address.)

Home Design's expert Kevin Alter compared HDS-2089 to the Laurent and Dakota plans, describing the plans as "extraordinarily similar." Alter noted that "the overall shape, the massing,[2] the individual layout of the rooms is the same. The[ rooms] all have the same shape, width, and length. . . . The[ plans] have the same organization of rooms. You enter the foyer, the dining room and living room on other side." Alter further explained that the "overall organization of traffic patterns" and arrangement of rooms is the same.

Although Alter acknowledged "modest differences" among the plans he compared, he also highlighted some mutual unusual design choices. On both HDS-2089 and the Turner plans, the partition dividing the kitchen and the family room does not extend all the way to the ceiling, but instead falls two feet short. Furthermore, the master bedrooms are oddly spacious for plans that are otherwise arranged efficiently. The master bedroom on both plans also includes an angled wall that makes furniture placement awkward. And the master closet opens onto the master bathroom, not the bedroom, which Alter described as "a little bit unusual" and "not ideal." Finally, the Laurent plan includes the same thick bathroom wall as the HDS-2089, even though only HDS-2089 has its plumbing arranged so that the thick wall is necessary. Besides identifying these unusual

---

[2] According to Alter, "massing" means "the overall shape of the volume, the shape, the particularities of [a plan's] overall configuration."

6

design choices, Alter classified certain differences between the plans, like the placement of the fireplace, as "afterthoughts."

On cross-examination, Turner pressed Alter on the originality of HDS-2089. Alter conceded that HDS-2089 "does not appear unusual" and is not "radically different [from] the many things that are on the market."  Alter further allowed that HDS-2089 featured many industry-standard design choices, including the adjacency of the dining room and breakfast nook to the kitchen, the split arrangement of the master bedroom along one exterior wall and the secondary bedrooms along the other, and the dimensions of the secondary bedrooms.

Turner then rebutted with the expert testimony of Robert Koch.  Koch began by reviewing the industry standards governing the overall layout of a four–three split plan, and describing the various considerations that drove the standards. Koch then identified numerous plans, including but not limited to HDS-2089 and the Turner plans, that shared an overall layout reflecting industry standards.[3]  Koch also identified differences between HDS-2089 and the Turner plans, many of

---

[3] In his comparison, Koch referred to a different one of the Laurent's many iterations.

7

which he chalked up to the Laurent being more "traditional" than HDS-2089,

which Koch described as "modern," "casual," and "relaxed":

| | HDS-2089 | Laurent (Koch version) |
|---|---|---|
| Front Porch | Small porch; different configuration and columns | "[V]ery expensive front porch that reache[s] from the front door all the way over [to] the bedroom . . . on the opposing side"; different configuration and columns |
| Front Door | Double doors | Single door |
| Foyer | No cased openings or headers above the walls in the foyer separating living room and dining room | Formal cased openings to living room and dining room |
| Family Room | Modern sliding-glass door; Fireplace not located to accommodate a flat-screen television | Traditional French doors; formal windows; Fireplace located to accommodate a flat-screen television |
| Back Porch/Patio | Patio; backdoor to patio swings outward | Porch; backdoor swings inward |
| Nook | Contiguous glass partition | Separate windows |
| Master Bedroom | Double doors; single high window located above headboard | Single door to restrict views into bedroom; formal, conventionally located windows |
| Hallways | Different dimensions and openings | Different dimensions and openings |
| Master Bathroom | Opening to master bedroom; water closet orientation creates shallower space at end of kitchen/nook hallway; toilet not obscured from view; linen closet separates water closet and shower; doorless shower | Door to master bedroom; water closet orientation creates deeper space at end of kitchen/nook hallway; toilet obscured from view; linen closet separates bathtub and shower; traditional shower door |
| Garage | Door to laundry room swings inward | Door to laundry room swings outward |
| Kitchen | Desk next to range; wall separating kitchen and family room does not extend to ceiling | Cabinetry next to range; wall separating kitchen and family room extends to ceiling |
| Secondary Bathroom | Different style countertops and access to water closet | Different style countertops and access to water closet |
| Pool Bathroom | Linen closet | No linen closet |
| Secondary Bedrooms | Different windows and dimensions | Different windows and dimensions |
| Living Room | Different ceiling height; angled wall separating living room and family room | Different ceiling height; squared wall separating living room and family room |

8

Koch also drew a global distinction between the HDS-2089 and the Laurent in terms of their elevations. Finally, Koch compared HDS-2089 to one of Turner's Dakota plans, and identified a slew of other differences. (Given the variety in Turner plans, Koch agreed that different Turner plans would have different differences with respect to HDS-2089.)

The jury returned a verdict in favor of Home Design, finding that the Turner plans infringed on HDS-2089 and awarding Home Design $127,760 in damages. Turner moved for judgment as a matter of law under Rule 50(b). According to Turner, no reasonable jury could have found the Turner plans "substantially similar" to HDS-2089.

The district court granted Turner's Rule 50(b) motion. At the outset, the district court recounted Koch's testimony regarding the "numerous, material" differences between HDS-2089 and the Laurent, as well as Koch's generalization that these differences rendered the Laurent traditional where HDS-2089 was modern. The district court then continued,

> The[ differences identified by Koch] are relevant [to whether a reasonable jury could have found the Turner plans "substantially similar" to HDS-2089] and must be considered at the level of protected expression. Although Home Design's expert Kevin Alter described these differences as "modest," the Eleventh Circuit has made clear that "modest dissimilarities" are significant when comparing architectural works, due to the fact that "there are only a limited number of ways" to organize standard architectural features, such that "similarities in the general layout of rooms can easily occur innocently." Thus, the fact that the floor plans at issue are similar in their overall layout is not

9

dispositive, but more importantly, the inclusion of standard architectural features, such as large living spaces in the middle of the home or secondary bedrooms located on a particular side of the house, are merely "ideas" that are generally unprotected [under copyright law] (for example, the concept of a "split-bedroom" plan). Accordingly, although the general layout of each floor plan at issue is similar, . . . the [c]ourt finds the dissimilarities dispositive, especially in light of the instruction that "modest dissimilarities" are more significant in architectural designs than they are in other types of art works. . . .

[T]he [c]ourt finds that no jury following the [c]ourt's instructions on the law could reasonably find the Laurent and Dakota designs *substantially* similar to HDS-2089 given the amount of significant dissimilarities between the plans at the level of protected expression. To find infringement on this record, the jury in this case must have disregarded the significant differences that existed at the level of protected expression and focused instead on the unprotected similarities in the designs. This is erroneous as a matter of law.

Accordingly, the district court granted Turner's Rule 50(b) motion, and instructed the clerk to enter judgment against Home Design.

On appeal, Home Design contests the district court's judgment notwithstanding the jury's verdict. According to Home Design, a reasonable jury could and did find that the Turner plans were "substantially similar" to HDS-2089. After considering Home Design's appeal, we affirm.

## **JURISDICTION AND STANDARD OF REVIEW**

The district court had jurisdiction pursuant to 28 U.S.C. § 1338(a) (2012) and 28 U.S.C. § 1331. We exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291. We review a district court's ruling on a motion for judgment as a matter of law *de novo*. *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 723 (11th Cir.

10

2012).  "Under Rule 50, a court should render judgment as a matter of law when . . . there is no legally sufficient evidentiary basis for a reasonable jury to find for [the nonmoving] party."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149, 120 S.Ct. 2097, 2109 (2000) (citation omitted).  The court reviews "all the evidence, drawing all reasonable inferences in favor of the nonmoving party."  *Hubbard*, 688 F.3d at 724.

## DISCUSSION

Copyright infringement has two elements: "(1) ownership of a valid copyright, and (2) copying of [protectable] elements."  *Miller's Ale House, Inc. v. Boyton Carolina Ale House, LLC*, 702 F.3d 1312, 1325 (11th Cir. 2012) (alteration in original) (quoting *Oravec v. Sunny Isles Luxury Ventures, LLC*, 527 F.3d 1218, 1223 (11th Cir. 2008)).  The second element can be proven either with direct proof of copying or, if direct proof is unavailable, "by demonstrating that the defendants had access to the copyrighted work and that the works are 'substantially similar.'"  *Oravec*, 527 F.3d at 1223 (citation omitted).  It is undisputed on appeal that Home Design owns a valid copyright to HDS-2089.  It is also undisputed that, while Home Design lacks direct evidence that Turner copied HDS-2089, Turner did have access to the floor plan.  Therefore, Home Design will prevail on appeal if Turner fails to show that no "reasonable jury could find [HDS-2089 and the Turner plans]

11

substantially similar at the level of protected expression." *Miller's Ale House*, 702 F.3d at 1325.

The back end of this formula ("level of protected expression") is meaningful, because not every nook and cranny of an architectural floor plan enjoys copyright protection.[4] First, floor plans, like any work, receive copyright protection only to the extent that they qualify as "original works of authorship." 17 U.S.C. § 102(a). And, again like any work, floor plans are subject to the "fundamental axiom that copyright protection does not extend to ideas but only to particular expressions of ideas." *Oravec*, 527 F.3d at 1224. The line between idea and expression is not a bright one, and must be drawn on a case-by-case basis. *Id.* at 1224–25. In general, though, it is useful to keep in mind the reason the line exists: to strike a balance between incentivizing original expression on the one hand and promoting the free flow of ideas on the other. *Id.* Architectural floor plans are not protected by copyright to the extent that they portray ideas, rather than expressions of ideas.

Second, and more concretely, the Copyright Act restricts which elements of architectural floor plans are protectable through its definition of a copyrightable "architectural work." 17 U.S.C. § 101 defines an "architectural work" as "the

---

[4] We intend nook and cranny figuratively here, and are not yet addressing the actual nook shared by HDS-2089 and the Turner plans.

12

design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings.  The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features."  According to legislative history, "individual standard features" include "common windows, doors, and other staple building components."  H.R. Rep. No. 101-735 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 6935, 6949.  The upshot of the idea–expression distinction and the statutory definition of "architectural work" is that, "while individual standard features and architectural elements classifiable as ideas are not themselves copyrightable, an architect's original combination or arrangement of such [elements] may be."  *Oravec*, 527 F.3d at 1225.

In *Intervest Construction, Inc. v. Canterbury Estate Homes, Inc.*, we likened the statutory definition of "architectural work" to that of a "compilation."  554 F.3d 914, 919 (11th Cir. 2008).  Based on the similarity, we concluded that architectural works received the same "thin" copyright protection awarded to compilations (as opposed to the "thicker" protection we would afford creative or derivative works).  *Id.* at 919–20 & n.3.  "Thus, when viewed through the narrow lens of compilation analysis[,] only the original, and thus protected[,] arrangement and coordination of spaces, elements[,] and other staple building components should be compared."  *Id.* And we also took the opportunity to explain why it is appropriate for judges to rule

13

out substantial similarity in cases where no reasonable jury could conclude

otherwise:

> [A] judge is better able to separate original expression from the non-original elements of a work where the copying of the latter is not protectable and the copying of the former is protectable. The judge understands the concept of the idea/expression dichotomy and how it should be applied in the context of the works before him. . . . Because a judge will more readily understand that all copying is not infringement . . . the "substantial-similarity" test is more often correctly administered by a judge rather than a jury—even one provided proper instruction. The reason for this is plain—the ability to separate protectable expression from non-protectable expression is, in reality, a question of law or, at the very least, a mixed question of law and fact. It is difficult for a juror, even properly instructed, to conclude, after looking at two works, that there is no infringement where, say, 90% of one is a copy of the other, but only 15% of the work is protectable expression that has not been copied.

*Id.* at 920 (citation omitted).

Turning to the particular floor plans at issue in *Intervest*, we concluded that

no reasonable jury could deem them substantially similar at the level of protected

expression.  Although the floor plans shared the same general layout, the district

court had identified and "focused upon the dissimilarities in [the] coordination and

arrangement" of "common components and elements."  *Id.* at 916, 922 app.  In the

abstract, the differences identified by the district court might come across as

modest:  The district court pointed out minor dimensional discrepancies between

the plans' rooms, slight changes in the presence, arrangement, or function of

various features, incremental modifications to a number of walls, and a smattering

14

of other dissimilarities. *Id.* at 916–18. Yet the district court ruled that these differences precluded a finding that the floor plans were substantially similar at the level of protected expression, and we affirmed. *Id.* at 921.

In *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95 (2d Cir. 2014), the Second Circuit voiced its agreement "with the outcome in *Intervest*, [but not] with its reasoning." *Id.* at 103. According to the Second Circuit,

> Labeling architecture a compilation obscures the real issue. Every work of art will have some standard elements, which taken in isolation are un-copyrightable, but many works will have original elements—or original arrangements of elements. The challenge in adjudicating copyright cases is not to determine whether a work is a creative work, a derivative work, or a compilation, but to determine what in it originated with the author and what did not. *Intervest* fails to do this. It compares the floor plans of the two houses, "focusing only on the narrow arrangement and coordination" of what it deems "standard . . . features" and intuits that there was no copying of the arrangement. But it fails to provide any analysis of what made a feature "standard" and unprotectable.

*Id.* at 104 (citation omitted). The Second Circuit's critique of *Intervest* demonstrates a difference between how we have described our copyright-infringement doctrine versus how they do. In the Second Circuit, a court can rule out copyright infringement as a matter of law "either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar." *Id.* at 102 n.12 (quoting *Warner Bros. Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 240 (2d Cir. 1983) (emphasis omitted)). But the

Eleventh Circuit declined to adopt a similar two-part framework in *Oravec*, on grounds that the formulation was "not useful in [*Oravec*] because the two [parts] ultimately merge into a single inquiry: whether a reasonable jury could find the competing designs substantially similar at the level of protected expression." 527 F.3d at 1224 n.5. In *Intervest*, we framed our holding in terms of the merged inquiry from *Oravec*. *See Intervest*, 554 F.3d at 916, 921. When recounting *Intervest* in *Zalewski*, however, the Second Circuit used terminology from the first part of its two-part framework. According to the Second Circuit, we "intuit[ed] that there was no copying of the [protected] arrangement," in other words "that any copying of the plaintiff's house designs went only to standard architectural features arranged in standard ways." *Zalewski*, 754 F.3d at 103–04.

The Second Circuit also used the first part of its framework to decide *Zalewski*. At the outset, the Second Circuit catalogued various unprotectable standard elements of architectural works:

> [Because e]fficiency is an important architectural concern[, a]ny design elements attributable to building codes, topography, structures that already exist on the construction site, or engineering necessity should . . . get no protection.
> 
> [In addition, t]here are *scenes-à-faire*[, or customary styles,] in architecture. Neoclassical government buildings, colonial houses, and modern high-rise office buildings are all [examples of] recognized styles from which architects draw. Elements taken from these styles should get no protection. Likewise, there are certain market expectations for homes or commercial buildings. Design features used by all architects, because of consumer demand, also get no protection.

16

*Id.* at 105.  With respect to the floor plans before the Second Circuit in *Zalewski*, the court held that "even if Defendants copied Zalewski's [colonial home] plans, they copied only the unprotected elements of his designs."  *Id.* at 106.  The Second Circuit observed that many design similarities concerned uncopyrightable elements that were "a function of consumer expectations and standard house design generally" or "conventions" inherent to "all colonial homes."  *Id.*[5]  The Second Circuit then identified various "subtle differences" between Zalewski's and the defendants' plans:

> [T]here are subtle differences in the paneling, size, and framing of Plaintiff's and Defendants' doors.  These differences are not great, but given the constraints of a colonial design, they are significant.  The same is true of the windows and garage doors that Plaintiff claims are identical.  They are quite similar in location, size, and general design, but again, the similarities are due primarily to the shared colonial archetype.  The window panes, shutters, and garage-door paneling all have subtle differences.  Likewise, the designs' shared footprint and general layout are in keeping with the colonial style.  There are only so many ways to arrange four bedrooms upstairs and a kitchen, dining room, living room, and study downstairs.  Beyond these similarities, Plaintiff's and Defendant's layouts are different in many ways.  The exact placement and sizes of doors, closets, and countertops often differ as do the arrangements of rooms.

---

[5] The Second Circuit also provided a vivid explanation as to why Zalewski could not copyright colonial-home conventions.  "Great artists often express themselves through the vocabulary of existing forms. Shakespeare wrote his Sonnets; Brahms composed his *Hungarian Dances*; and Plaintiff designed his colonial houses. Because we must preserve these forms for future artists, neither iambic pentameter, nor European folk motifs, nor clapboard siding are copyrightable."  *Id.*

*Id.* at 106–07.  Because Zalewski's plans were drawn in the colonial style, and because defendants' plans differed in numerous subtle ways from Zalewski's, the Second Circuit found no copyright infringement.

We agree with both the reasoning and outcome of *Zalewski*.  If "the similarity between two works concerns only non-copyrightable elements," then there can be no copyright infringement as a matter of law.  754 F.3d at 102 n.12.  Customary styles and efficiency- or expectation-driven industry standards are not susceptible to copyright.  *Id.* at 105.  And when floor plans are drawn in a customary style and to industry standards, even "subtle differences" like those in *Zalewski* can indicate that there is no copyright infringement.  *Id.* at 106–07.[6]  After all, customary styles and industry standards, though not themselves copyrightable, often control room placement and features.  *Id.*

We also agree that *Intervest* is best couched as holding that there was no copyright infringement because the floor plans at issue were similar only with respect to their noncopyrightable elements.  Although the *Intervest* floor plans shared the same overall layout, the layout was not copyrightable in that case.  *See Intervest*, 554 F.3d at 916, 922 app.  And the chosen layout restricted "the variety

---

[6] As already noted, *Zalewski* identified subtle differences in (1) "the paneling, size, and framing of Plaintiff's and Defendant's [front] doors," and (2) the "window panes, shutters, and garage-door paneling."  *Zalewski* also specified that "[t]he exact placement and sizes of doors, closets, and countertops often differ as do the arrangements of rooms."  *Id.* at 106–07.

of ways [the floor plans] c[ould] be divided into [four] bedrooms, [three] baths, a kitchen, a great room or living room, closets, porches, etc." *Howard v. Sterchi*, 974 F.2d 1272, 1276 (11th Cir. 1992). "Consequently, differences . . . weigh[ed] heavily against a finding of substantial similarity." *Miller's Ale House*, 702 F.3d at 1326. Because the layouts were noncopyrightable, and because the floor plans differed in terms of dimensions, wall placement, and the presence and arrangement of particular features (or use of slightly varied features), we held that the similarities between the plans concerned only their noncopyrightable elements. *See Intervest*, 554 F.3d at 916–18, 921. There was therefore no copyright infringement.[7]

---

[7] It is important to frame *Intervest* as holding only that there is no copyright infringement when floor plans with the same *noncopyrightable* layouts also boast modest differences such as those in *Intervest*. A more expansive reading would nearly eliminate copyright protection for architectural works. Specifically, if *Intervest* is read as holding that modest differences between floor plans always preclude copyright infringement, then even a plan with an entirely original layout would receive no copyright protection so long as the copying plan bore some superficial differences. That is not the correct result. The Copyright Act protects "original works of authorship," including "architectural works." 17 U.S.C. § 102.

Also, although we agree with the Second Circuit that *Intervest* is best framed under the first part of the Second Circuit's two-part framework, we do not abandon the merged inquiry from *Oravec* as a general matter. In many, perhaps most, copyright-infringement cases, sorting out the copyrightable and uncopyrightable elements of floor plans will be unnecessary because the floor plans will be so obviously different (in terms of overall layout or otherwise) that no reasonable jury could find the floor plans substantially similar at the level of protected expression. *E.g.*, *Miller's Ale House*, 702 F.3d at 1326–27 (no reasonable jury could find sports-bar-and-restaurant floor plans substantial when central bars had different locations and interior seating was "markedly different," among other dissimilarities); *Oravec*, 527 F.3d at 1223 (no reasonable jury could find high-rise condominiums substantially similar given, among other differences, "concave/convex concept" featured on both sides of Oravec's design but only one side of Trump's).

19

Taken together, *Intervest* and *Zalewski* also support the proposition that courts are best-situated to determine whether similarity between two architectural works concerns only their noncopyrightable elements. In *Intervest*, we held that "separat[ing] protectable expression from non-protectable expression is . . . a question of law or, at the very least, a mixed question of law and fact." *Intervest*, 554 F.3d at 920. *Zalewski* effectuated the *Intervest* holding insofar as the Second Circuit took it upon itself not only to partially define noncopyrightable expression (customary styles, industry standards), but also to hold that in light of the floor plans' shared colonial style, subtle differences demonstrated the absence of copyright infringement. *Cf. Zalewski*, 754 F.3d at 105–07.

*Intervest* and *Zalewski* control this case. Although HDS-2089 and the Turner plans share the same general layout, this is only because both sets of plans follow the customary four–three split style, as well as the attendant industry standards. Kevin Alter, Home Design's own expert, conceded on cross-examination that HDS-2089's split-bedroom arrangement aligns with industry standards, as does the contiguity of the dining room, breakfast nook, and kitchen. Alter further characterized HDS-2089 as neither "unusual" nor "radically different [from] the many things that are on the market." No one, including Home Design, owns a copyright to the idea of a four–three split style, nor to the industry

20

standards that architects regularly heed to achieve such a split. *Cf. Zalewski*, 754 F.3d at 105–06.

It might be objected that, here, HDS-2089 and the Turner plans share unusual design choices that disrupt the customary four–three split style and constitute protectable expression. Of the finite number of ways to permute a rectangle into a four–three plan, some ways may involve unique or unusual design choices. To the extent that a four–three plan departs from customary style and industry standards and espouses unusual design choices, those choices may constitute protectable expression. After all, the Copyright Act protects "original works of authorship," including the "arrangement and composition of spaces and elements" in a floor plan. 17 U.S.C. §§ 101–102.

The problem for Home Design is that the design choices in HDS-2089 are not unusual. Alter noted that both HDS-2089 and the Turner plans showcase a kitchen–family-room partition that fails to couple with the ceiling, an oddly spacious and angled master bedroom, a master closet that opens onto the master bathroom (instead of the bedroom), and a thick bathroom wall, despite the fact that only HDS-2089 has plumbing that requires such a sturdy wall. But, again, Alter outright said that HDS-2089 is not "unusual." He further stated that HDS-2089 is not "radically different [from] the many things that are on the market." We therefore conclude that the design choices identified by Alter are not unusual, but

21

humdrum.[8]  HDS-2089 reflects the customary style of a four–three split plan,

which is not entitled to copyright protection.

In light of the constraints imposed by a four–three split style, the differences

between HDS-2089 and the Turner plans demonstrate the absence of copyright

infringement.  The differences between HDS-2089 and the Turner plans are

differences in dimensions, wall placement, and the presence, arrangement, and

function of particular features around the house.  Because the same sorts of

differences indicated no infringement in *Intervest*, that result follows in this case as

well.  *See Intervest*, 554 F.3d at 916–18.[9]

Home Design implores us to depart from *Intervest* insofar as it "suggests

that judges are better equipped than juries to apply the substantial similarity test to

architectural works at the summary judgment stage."  Home Design "respectfully

---

[8] An investigation of other floor plans available to us lends additional, though unnecessary, support to our position.  Half of the so-called unusual design choices can be found in, of all places, the *Intervest* plans.  The *Intervest* master bedrooms are larger in proportion to their overarching plans than the master bedrooms in this case, even though Alter dubbed the master bedrooms in HDS-2089 and the Turner plans oddly spacious.  *See Intervest*, 554 F.3d at 922 app.  Also, the *Intervest* plans double down on walk-in closets letting onto the master bathroom (not the bedroom), despite Alter saying that this arrangement is "a little bit unusual" and "not ideal."  *Id.*  The *Intervest* plans' inclusion of these design choices suggests that they are not unusual.

An examination of Home Design's Timberwood further confirms our position.  The Timberwood plan shares HDS-2089's relative master-bedroom proportions and angled walls, and bathroom-accessed master closets.  Design choices that are common among many floor plans are, by definition, not unusual.

[9] Of course, differences besides those in *Intervest* can indicate the absence of copyright infringement between floor plans drawn in the same customary style and to industry standards.  The differences in *Zalewski*, for example, fit the bill.  754 F.3d at 106–07.

submit[s] that *Intervest*'s assumption about a district court's superior ability to identify protected features of an architectural work should be revisited." After all, Home Design reminds us, "[j]udges are not generally students of architecture. Nor are they, by their position, smarter than jurors."

Home Design also distinguishes *Intervest* from this case in terms of procedural posture. One postural distinction is that, in *Intervest*, we reviewed the district court's grant of summary judgment. No jury verdict was involved. By contrast, in this case, we review the district court's grant of judgment notwithstanding the jury's verdict. A second difference is that, in this case, the district court denied Turner's prior motion for summary judgment before changing course following the jury's verdict. According to Home Design, one or both of these differences portend a change in result.

We are not convinced. Although we agree with Home Design that judges are neither architecture students nor bestowed by rite with special intelligence, we stand by the core premise that judges can, in certain cases, remove the question of substantial similarity from jury consideration. We have repeatedly sanctioned summary judgment determinations that one architectural work does not infringe on another as a matter of law. *Miller's Ale House*, 702 F.3d at 1326; *Intervest*, 554 F.3d at 920–21; *Oravec*, 527 F.3d at 1223; *Beal v. Paramount Pictures, Corp.*, 20 F.3d 454, 459–60 (11th Cir. 1994). This practice should be unremarkable to all:

23

The whole purpose of summary judgment and judgment as a matter of law is to allow judges to remove questions from the jury when the evidence can support only one result.  And we have further held that identifying floor plans' unprotected portions is a question of law.  *See Intervest* 554 F.3d at 919–20.  We are not alone: *Zalewski* squarely backs this holding.  *Cf. Zalewski*, 754 F.3d at 102.  Interpreting the law is for a judge, not a jury.  If a judge concludes that floor plans are drawn in a customary style and to industry standards, then differences between the floor plans can relegate the plans' similarities to the level of noncopyrightable elements.  A judge faced with such a situation can and should remove substantial similarity from the jury, just as the district court did below.

In light of judges' role in sometimes removing the question of substantial similarity from the jury, Home Design's postural distinctions between this case and *Intervest* are immaterial.  All the jury's verdict in favor of Home Design shows is that the jury reached an unsupportable result.  Rule 50(b) operates as an escape valve for precisely this situation.  And the district court's change of heart between summary judgment and judgment as a matter of law is equally irrelevant.  A "prior denial of summary judgment does not rule out the possibility of a subsequent directed verdict."  *Gross v. Southern Ry. Co.*, 446 F.2d 1057 (5th Cir. 1971).[10]  We

---

[10] Decisions of the Fifth Circuit handed down before September 30, 1981 are binding on the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

24

agree with the result that the district court ultimately reached after the jury's verdict:  The Turner plans do not infringe on HDS-2089 as a matter of law.[11]

## CONCLUSION

For the foregoing reasons, we affirm the district court's judgment notwithstanding the jury's verdict.

**AFFIRMED.**

---

[11] Home Design also argues that the district court misapplied the Rule 50 standard.  We disagree.  Finally, because we agree with the district court that no reasonable jury could find HDS-2089 and the Turner plans substantially similar, we do not reach Home Design's subsidiary argument that the jury awarded insufficient damages.

25

ROSENBAUM, Circuit Judge, concurring:

I agree with the panel's conclusion that our decision in *Intervest Construction, Inc. v. Canterbury Estate Homes, Inc.* ("*Intervest*"), 554 F.3d 914 (11th Cir. 2008), drives this case and requires affirmance of the district court's entry of judgment under Rule 50. But I think that *Intervest* represents a wrong turn in our Circuit's copyright jurisprudence. Specifically, *Intervest* holds that judges are necessarily better able than juries to resolve whether the "average lay observer" would find "substantial similarity" between two architectural works. But we ask juries to answer this same question in all kinds of other copyright cases. Because I do not see a basis for exempting copyright cases involving architectural works from jury trials simply because the question of "substantial similarity" may be close, I respectfully disagree with *Intervest* and would steer clear of its holding, were we not bound by it.

To establish copyright infringement, a plaintiff must prove (1) that it owns a valid copyright and (2) that the defendant copied original—meaning "protectable"— elements of the work. *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1223 (11th Cir. 2008). As the Supreme Court has explained, "The mere fact that a work is copyrighted does not mean that every element of the work may be protected. Originality remains the *sine qua non* of copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author." *Feist*

26

*Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348, 111 S. Ct. 1282, 1289 (1991).

Where, as here, a plaintiff lacks direct proof of copying, the plaintiff may establish the element of copying by showing that the defendant "had access to the copyrighted work and that the works are 'substantially similar.'" *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1248 (11th Cir. 1999). The test for "substantial similarity" is not at all technical. To the contrary, "substantial similarity" exists where "an *average lay observer* would recognize the alleged copy as having been appropriated from the copyrighted work." *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 829 (11th Cir. 1982) (emphasis added).

Because a copyright owner holds the rights to only those portions of his or her work that are original, the copyright owner must demonstrate "both [that] the similarities between the works are substantial from the point of view of the lay observer and [that] those similarities involve copyrightable material." *Oravec*, 527 F.3d at 1224 (internal alteration omitted); *see id.* n.5. In other words, the "substantial similarity" must exist at "the level of protected expression." *Id.* at 1227.

Whether two works are "substantially similar" at the level of protected expression seems to me to be an inherently subjective and fact-bound inquiry. "At the most narrow, focused level, two works will almost always be distinguishable, and at the broadest level of abstraction they will almost always appear identical."

27

*Baby Buddies, Inc. v. Toys R Us, Inc.*, 611 F.3d 1308, 1316 (11th Cir. 2010).  As a result, "[l]ists of similarities between the two works are inherently subjective and unreliable, particularly where the list contains random similarities, and many such similarities could be found in very dissimilar works."  *Herzog*, 193 F.3d at 1257 (internal quotation marks omitted).

Indeed, long ago, Judge Learned Hand explained why the "substantially similar" inquiry will nearly always be subjective and *ad hoc*:

> Upon any work . . . a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out.  The last may perhaps be no more than the most general statement of what the [copyrighted work] is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the [copyrighter] could prevent the use of his ideas, to which, apart from their expression, his property is never extended.  Nobody has ever been able to fix that boundary, and nobody ever can.

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930).  Because "substantial similarity is an extremely close question of fact" the determination of which is by necessity subjective and *ad hoc*, "summary judgment has traditionally been frowned upon in copyright litigation."  *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1232 (11th Cir. 2010) (internal citation omitted); *see also Peter Letterese and Assocs., Inc. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1302 (11th Cir. 2008) ("Historically, courts have hesitated to make determinations as to

28

infringement or non-infringement on a summary judgment motion because of their reluctance to make subjective determinations regarding the similarity between two works." (internal quotation marks and alteration omitted)).

Nor is the question of whether "substantial similarity" exists at the level of "protectable expression" a question unique to copyright actions involving architectural works. Rather, it is one that we must answer in every copyright action, regardless of whether the object of the copyright is a book, a piece of artwork, or an architectural work.

Books and movies, for example, often include non-copyrightable elements such as *scènes à faire*—"sequences of events which necessarily follow from a common theme," or "[i]ncidents, characters, or settings that are indispensable or standard in the treatment of a given topic." *Herzog*, 193 F.3d at 1248. So in cases involving those media, juries regularly must separate the unprotected elements from those that are copyrighted before determining whether "substantial similarity" exists between the original and the alleged copy.

Cases involving "compilations"—"work[s] formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship," 17 U.S.C. § 101—likewise require the factfinder to determine whether "substantial similarity" exists between the protectable elements of a

29

compilation and an alleged copy.  We have had no problem finding juries capable of distinguishing between protected elements and unprotected elements in these types of cases.  *See, e.g.*, *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129 (11th Cir. 2007).

In *Intervest*, however, we departed from the rule of having juries decide the inherently fact-bound issue of whether two works are "substantially similar" and crafted a new rule for cases involving "architectural works."  554 F.3d at 920-21. Specifically, we held that judges are generally better able to conduct this inquiry at summary judgment than jurors are at trial.  *Id.* at 919-20.

In arriving at this new rule, we first opined that the Copyright Act of 1976's definition of "architectural work" "closely parallels that of a 'compilation'"; so, as with compilations, "any similarity comparison of [architectural works] . . . must be accomplished at the level of protected expression—that is, the *arrangement* and *coordination* of" "common windows, doors, and other staple building components." *Id.* at 919.  Based on this analogy, we cited the Supreme Court's decision in *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 349, 111 S. Ct. 1282, 1289 (1991), for the proposition that copyright protection in an architectural work, like a compilation, is "thin."  *Intervest*, 554 F.3d at 919.

Then we opined that judges, not jurors, are best equipped to conduct the "substantial similarity" inquiry in cases involving architectural works.  *Id.* at 920-

30

21.  We reasoned,

> [A] judge is better able to separate original expression from the non-original elements of a work where the copying of the latter is not protectable and the copying of the former is protectable.  The judge understands the concept of the idea/expression dichotomy and how it should be applied in the context of the works before him.  As we have observed: "This distinction—known as the idea/expression dichotomy—can be difficult to apply, as there is no bright line separating the ideas conveyed by a work from the specific expression of those ideas." *Oravec* [*v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d [1218, 1224 (11th Cir. 2008)].  Moreover, in examining compilations wherein only the arrangement and coordination of elements which by the nature of the work (here architectural floor plans) are sure to be common to each of the works and are not copyrightable themselves (special [sic] depictions of rooms, doors, windows, walls, etc.), the already difficult tasks may become even more nuanced.  Because a judge will more readily understand that all copying is not infringement, particularly in the context of works that are compilations, the "substantial-similarity" test is more often correctly administered by a judge rather than a jury—even one provided proper instruction.  The reason for this is plain—the ability to separate protectable expression from non-protectable expression is, in reality, a question of law or, at the very least, a mixed question of law and fact.  It is difficult for a juror, even properly instructed, to conclude, after looking at two works, that there is no infringement where, say, 90% of one is a copy of the other, but only 15% of the work is protectable expression that has not been copied.

*Id.*

I think we lost our way in *Intervest*.  While I agree with the majority that our decision in *Intervest* compels us to affirm the district court's decision in this case, I

31

believe the unique rule we crafted for architectural works is unmoored from traditional copyright jurisprudence. I find no reason that survives scrutiny which warrants treating the "substantially similar" inquiry in copyright cases involving "architectural works" differently than the "substantially similar" inquiry in other copyright cases.

True, in *Feist*, the Supreme Court explained that the protection afforded factual compilations is "thin" in the sense that the raw materials of a compiler's medium—namely, facts—are not themselves copyrightable. 499 U.S. at 349, 111 S. Ct. at 1289. But this is just another way of saying that the factfinder must consider whether "substantial similarity" exists at the level of protectable expression— original content—only, and the amount of protectable expression relative to total content in a compilation is less than in a more original type of work. Whatever protectable expression a compilation contains, however, remains subject to the same copyright protection as the original content in all other types of copyrighted work. *See id.* at 349, 111 S. Ct. at 1290 ("[C]opyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work. . . . This principle, known as the idea/expression or fact/expression dichotomy, applies to *all* works of authorship.") (emphasis added).

Indeed, when Congress amended the Copyright Act to include "architectural

works" in 1990, it did so because it recognized that "[a]rchitecture is not unlike poetry" and "concluded that the design of a work of architecture is [therefore] a 'writing' under the Constitution and fully deserves protection under the Copyright Act." H.R. Rep. No. 101–735 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 6935, 6941. Put simply, the protectable elements of an "architectural work," though they may be fewer and therefore "thin" relative to other works, are nonetheless entitled to the full protection of the Copyright Act.

So the "thinness" or "thickness" of protected expression in a type of work merely defines the frame of reference for the "substantial similarity" inquiry. *See Oravec*, 527 F.3d at 1224 (explaining that the similarity inquiry targets the similarity between the protectable expression of a copyrighted work and the expression in an allegedly infringing work). But once we are looking at protectable expression, I see no meaningful difference in the substance of the "substantially similar" inquiry applicable to works entitled to "thick" protection, such as novels, and that inquiry applicable to works entitled to "thin" protection, such as architectural works. Regardless of the type of work at issue, a copyright plaintiff will always be required to demonstrate substantial similarity "at the level of protected expression." *Id.* at 1227.

To the extent that *Intervest* suggests that the protectable expression in an architectural plan is somehow subject to less protection than the protectable

33

expression in any other kind of copyright-protected content, the Second Circuit aptly

summed up the problems with our approach in *Intervest*:

> Labeling architecture a compilation obscures the real issue. Every work of art will have some standard elements, which taken in isolation are un-copyrightable, but many works will have original elements—or original arrangements of elements. The challenge in adjudicating copyright cases is not to determine whether a work is a creative work, a derivative work, or a compilation, but to determine what in it originated with the author and what did not. *Intervest* fails to do this. . . .
>
> Courts should treat architectural copyrights no differently than other copyrights. This is what Congress envisioned . . . .

*Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 104 (2d Cir. 2014).

But the most troubling aspect of our decision in *Intervest* is our conclusion

that judges are more able to conduct the inherently factual and subjective

"substantially similar" inquiry in architectural-works cases than jurors. *Intervest*,

554 F.3d at 920-21. I respectfully disagree with this determination.

The Seventh Amendment guarantees parties like Turner a jury trial. While

the Copyright Act does not explicitly provide copyright plaintiffs a right to a jury

trial, it does permit plaintiffs to recover either actual or statutory damages for

violations of the Act. 17 U.S.C. § 504. And when a plaintiff seeks to recover either

actual or statutory damages under the Act, the Seventh Amendment guarantees that

plaintiff a right to a jury trial. *Feltner v. Columbia Pictures Television, Inc.*, 523

34

U.S. 340, 355, 118 S. Ct. 1279, 1288 (1998); *see id.* at 346, 118 S. Ct. at 1284.

The Seventh Amendment, in turn, requires, where it applies, "that enjoyment of the right of trial by jury be not obstructed, and that the ultimate determination of issues of fact by the jury be not interfered with." *In re Peterson*, 253 U.S. 300, 310, 40 S. Ct. 543, 546 (1920). Of course, it has long been recognized "that when the evidence given at the trial, with all inferences that the jury could justifiably draw from it, is insufficient to support a verdict for the plaintiff, so that such a verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but may direct a verdict for the defendant" without violating the Seventh Amendment. *Randall v. Baltimore & O.R. Co.*, 109 U.S. 478, 481, 3 S. Ct. 322, 324 (1883); *see also Capital Traction Co. v. Hof*, 174 U.S. 1, 13-14, 19 S. Ct. 580, 585 (1899) ("'Trial by jury,' in the primary and usual sense of the term at the common law and in the American constitutions, . . . is a trial by a jury of 12 men in the presence and under the superintendence of a judge empowered to instruct them on the law and to advise them on the facts, and . . . to set aside their verdict, if, in his opinion, it is against the law or the evidence.").

But we do not remove factual determinations from a jury simply because the factual inquiry is "nuanced" or "difficult." *Cf. Intervest*, 554 F.3d at 920. Instead, we issue specific instructions to educate the jury on the nature of its inquiry and presume that the jury follows those instructions. Fed. R. Civ. P. 51; *Jamerson v.*

35

*Sec'y for Dep't of Corr.*, 410 F.3d 682, 690 (11th Cir. 2005) ("[W]e presume that juries follow instructions . . . ."). And, where necessary, we ask the jury to return special verdicts breaking out each factual determination the jury must make to guide the jury in its task. Fed. R. Civ. P. 49. Parties also may present expert testimony to assist the jury in its evaluation of the evidence. *See* Fed. R. Evid. 702.

In fact, we routinely entrust juries with highly technical and complex factual inquiries, including, for instance, issues such as whether one party infringed another's software patent, *see Telecom Tech. Servs., Inc. v. Rolm Co.*, 388 F.3d 820 (11th Cir. 2004); whether a party possesses monopoly power in a relevant market or has sufficient economic power to coerce another into buying a tied product in Sherman Antitrust Act cases, *see Tech. Res. Servs., Inc. v. Dornier Med. Sys., Inc.*, 134 F.3d 1458, 1465-66 (11th Cir. 1998); and whether a party has established loss causation in a § 10(b) case under the Securities and Exchange Act of 1934, *see Rousseff v. E.F. Hutton Co.*, 843 F.2d 1326, 1329 (11th Cir. 1988).

And we ask juries to make significantly weightier factual determinations than whether two works are "substantially similar," including, for instance, a criminal defendant's liability. Indeed, the Sixth Amendment demands that juries, *not judges*, make the weightiest of all factual determinations: whether capital punishment is warranted. *Ring v. Arizona*, 536 U.S. 584, 589, 122 S. Ct. 2428, 2432 (2002).

In short, when factual determinations are "nuanced" or "difficult," we educate

36

juries and provide them with the tools necessary to do the job.  We do not take the issues away from the jury and defer to judges.  I am aware of no case law that stands for the proposition that we may more readily remove factual determinations from the jury's purview when those determinations are, in the view of the judge, "difficult."

But even if such precedent existed, I would not see the sense in generally removing the issue of "substantial similarity" from the jury in any kind of copyright case, including those involving architectural works.  The standard for whether two works are "substantially similar" is whether "*an average lay observer* would recognize the alleged copy as having been appropriated from the copyrighted work." *Original Appalachian Artworks, Inc.*, 684 F.2d at 829 (emphasis added).

It is not clear to me why judges would be "better able to separate original expression from the non-original elements of a work where the copying of the latter is not protectable and the copying of the former is protectable." *Intervest*, 554 F.3d at 920.  I think it unlikely that many judges have architectural or even design experience.  So we have no more practical, real-world understanding of the significance of particular design elements necessary to make a determination about whether a given architectural work is substantially similar to another at the level of protected expression than does a jury.

That is not to say that we cannot make informed decisions regarding these

37

issues, upon reviewing appropriate evidence and applying the correct standard. Of course we can. But so can juries. Indeed, the very nature of the standard—"average *lay* observer"—suggests as much.[1]

I likewise respectfully disagree with any notion that judges have a special grasp on "the concept of the idea/expression dichotomy and how it should be applied in the context of the works before [them]." *Id.* No degree of mastery of the "concept of the idea/expression dichotomy" renders a judge better able to determine whether an *average lay observer* would recognize an alleged copy as having been appropriated from a copyrighted work.

Here, had we applied the same rules of copyright law that we use in cases involving copyrights on other types of works, the Rule 50 motion would have been properly denied because a material issue of fact existed. Specifically, an average lay observer could have concluded that the Turner plans are substantially similar to HDS-2089, evidencing unlawful copying.

Even a cursory glance at the blueprints reveals that, as HDS's CEO testified at trial, the Turner plans are "virtually line for line" copies of HDS-2089. *See* App. This fact led HDS's expert witness[2] to testify that "the overall organization of traffic

---

[1] Ironically, it seems more likely that at least some members of a jury would have architectural or design experience or training of some type and therefore actually have a practical understanding of the significance of various protectable design elements in an architectural work.

[2] HDS relied on the expert-witness testimony of Kevin Samuel Alter, Associate Dean for Graduate Programs and Professor of Architecture at the University of Texas at Austin.

patterns for the home[s]" appears to be identical. HDS's expert further testified that "the overall shape, the massing, the individual layout of the rooms is the same. They all have the same shape, width, and length. They have essentially the same massing . . . . They have the same organization . . . ." In other words, the selection and arrangement of common building elements in the Turner plans, in general, is nearly identical to the selection and arrangement in HDS-2089.

And beyond that, HDS's expert also noted that the plans contain certain odd features that are hard to explain if Turner did not unlawfully copy from HDS-2089. For example, one of the bathroom walls in both HDS-2089 and the Laurent plan is slightly thicker than the surrounding walls. This feature has a practical purpose in HDS-2089, but it makes no sense in the Laurent plan: in the HDS-2089, the thicker wall provides a way to accommodate the plumbing for a bath tub, but in the Laurent plan, the tub is turned, so the plumbing for the tub necessarily would not run through the thicker wall.

True, as the Majority points out, the plans have differences. The Majority notes, among others, that the door to the laundry room in the garage swings inwards in HDS-2089 and outwards in the Turner plans, and the plans' respective secondary bathrooms feature different countertops. *See id.* In *Intervest*, we held that similar sorts of differences as those identified by the Majority would have precluded a

39

reasonable jury from finding "substantial similarity." *See* 554 F.3d at 916-17. Respectfully, I disagree.

Instead, I would hold that "an average lay observer" could find these differences between the HDS-2089 and Turner plans to be immaterial in light of the plans' otherwise "substantial similarity" at the level of protected expression. Indeed, the first trial judge denied Turner's summary-judgment motion because the judge concluded that "there are . . . myriad similarities in areas of protectable expression," so a reasonable jury could find the works "to be substantially or even strikingly similar." And, after a five-day jury trial, a jury of average lay observers did just that, concluding that all 165 of the Laurent and Dakota houses at issue are "substantially similar" to HDS-2089. To second guess the jury at this stage based on nothing more than a list of modest dissimilarities—the very sort of list that we have already rejected as "inherently subjective and unreliable," *Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1257 (11th Cir. 1999)—seems to me to unjustifiably usurp the role of the jury in copyright cases and deny owners of architectural work copyrights the full protection of the Copyright Act.

So while I agree with the majority that our decision in *Intervest* dictates that we uphold the district court's decision granting Appellee's Rule 50 motion, I think it time to revisit *Intervest*.

40

TJOFLAT, Circuit Judge, Concurring:

I join the panel's opinion in full.  I write separately to address the purportedly untenable infirmities of *Intervest Construction, Inc. v. Canterbury Estate Homes, Inc.*, 554 F.3d 914 (11th Cir. 2008)—which I agree compels our decision today—that Judge Rosenbaum identifies.  Specifically, I deny that our decision in *Intervest* either requires or suggests an impermissibly broad role for judges at the expense of the jury right secured by the Seventh Amendment[1] in cases alleging copyright infringement of architectural works.

As an initial matter, *Intervest* in no way "*holds* that judges are necessarily better able than juries to resolve whether the 'average lay observer' would find 'substantial similarity' between two architectural works."  *Ante* at 1 (Rosenbaum, J., concurring) (emphasis added); *cf. Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) ("We have pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case. . . . And dicta is not binding on anyone for any purpose." (citations omitted)).  What *Intervest suggests* (and rightfully so), however, is that claims of copyright infringement are "often more reliably and accurately resolved in a summary

---

[1] The Seventh Amendment to the United States Constitution provides, "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any court of the United States, than according to the rules of the common law."  U.S. Const. amend. VII.

41

judgment proceeding" when the "crucial question" requires assessing "substantial similarity at the level of protectable expression" over types of works warranting only "'thin'" protection, like architectural works. *See* 554 F.3d at 919 (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 349, 111 S. Ct. 1282, 1289, 113 L. Ed. 2d 358 (1991)). Far from warranting reconsideration from this Court sitting en banc, that notion is both commonsensical and utterly unremarkable. Nothing in *Intervest* strips from juries their historically and constitutionally critical responsibility to make factual determinations. Rather, *Intervest* simply recognizes that when there are more legal determinations to be made relative to factual ones, judges will have relatively more to do. The role to be played by judges—who are, of course, responsible for delineating these legal boundaries—will necessarily be greater at summary judgment in cases in which the scope of the protectable expression is "thin" because "the ability to separate protectable expression from non-protectable expression is, in reality, a question of law or, at the very least, a mixed question of law and fact." *Id.* at 920. And this is especially so when, as is often true of these types of cases, the scope of the legally protectable expression at issue may be less than crystal clear.

In my view, there is no reason to revisit our holding in *Intervest* because *Intervest* was, and remains, correctly decided.

42

APPENDIX

**HDS-2089**



**The Laurent**

